IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | | |
|---|---|---|
| LARRY HENDERSON, | ) | |
| Plaintiff | ) | |
| v. | ) | No. 4:03-cv-95 |
| | | Jarvis/Guyton |
| LINCOLN COUNTY SHERIFF'S DEPARTMENT, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

This is an action for alleged discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, and for alleged retaliation in response to plaintiff's filing of an EEOC claim. Currently pending is defendant's motion for summary judgment [Court Files #13, #16, #34]. For the reasons that follow, the motion will be granted and this action dismissed.

I.

*Factual Background*

The following factual allegations are considered in the light most favorable to the plaintiff.

Plaintiff Larry Henderson was first employed by the Lincoln County Sheriff's Department in 1990 as a patrol deputy. From 1990 until 1994, he also worked as the road crew deputy and as a jailer. He was sent to the Tennessee Law Enforcement Training Academy in 1992.

In 1994, a new sheriff, Tom Bean, was elected and plaintiff was dismissed. Plaintiff had his first heart surgery in July 1994, just before his 52nd birthday. In late 1994, plaintiff applied for Social Security benefits indicating that he could not regain his strength following his surgery. He continued to receive those benefits until 1998. Beginning in 1996, he engaged in rehabilitative activities including walking as a primary activity. He worked his way up from walking one-and-a-half miles a day to five miles a day and could jog for about a half mile.

After Jimmy Mullins was elected Sheriff in 1998, plaintiff approached him about re-employment. After receiving a clean bill of health from plaintiff's doctor, Mullins hired him as a deputy sheriff and he reported to work on September 1, 1998. In his August 12, 1998 letter, plaintiff's cardiologist, Gordon Cash, M.D., did not place any work restrictions on the plaintiff. Sheriff Mullins personally spoke to Dr. Cash and Dr. Cash did not tell him that plaintiff could not work nights.

Neither plaintiff nor any other deputy sheriff was guaranteed any particular shift, either day or night, by Sheriff Mullins or Chief Deputy Bobby Fitch, although on many occasions the wishes of a particular employee were accommodated. When plaintiff went back to work in September 1998, it was on the day shift, working 6:00 a.m. to 6:00 p.m. Each shift, whether day or night, begins at 6:00 and ends at 6:00, thus lasting 12 hours. Each deputy must work a total of 84 hours over a two-week period. All shifts pay the same and there is no difference in responsibility or duties between shifts. Sheriff Mullins acknowledges that the day shift can be just as dangerous as the night shift.

The job of deputy sheriff has a number of physical requirements, and those who work in that job must be willing to serve in a "potentially dangerous/ physically challenging environment." All deputies that work in the Lincoln County Sheriff's Department must graduate from the Tennessee Law Enforcement Training Academy or equivalent and be certified by the State of Tennessee. This training requires participants to be able to pass strenuous physical requirements, as well as demonstrate a command of defensive and patrol tactics, firearms, and emergency vehicle operations. Additionally, all deputies must be able to effect an arrest on their own and be able to back up another deputy if necessary, for their own safety and that of fellow officers. All deputies must be able to use physical force to effect an arrest, including anything from light restraint to wrestling, using a weapon, running,

and the like. Plaintiff acknowledges that he would occasionally have to apprehend suspects and that the resulting confrontations could be violent at times.

Plaintiff testified in his deposition that he believed that he could perform his job, but only on the day shift. He did not believe that he would be able to back up other officers on the night shift because of sleepiness caused by a medication he was on. Thus, even though no restrictions had been placed on him by his physician, plaintiff claims that he could not work the night shift.

Plaintiff's job performance never caused Chief Deputy Fitch any concern. In addition, plaintiff acknowledges that he was not treated any differently than anyone else, nor did he expect to be.

Following his second heart surgery in the fall of 2000, plaintiff returned to work on light duty on October 5, 2000. At some point prior to Christmas, plaintiff returned to regular duty and continued to work the day shift. However, he never mentioned to his superiors that his energy level was down.

In May 2001, Chief Deputy Fitch posted a notice assigning the plaintiff and others to work the night shift. Following the notice being posted, plaintiff felt that he still suffered from fatigue that would affect his ability to work at night, and he

4

talked to Dr. Cash about working nights. Plaintiff testified about what Dr. Cash told him regarding working the night shift:

> A.  I just asked him about reckon I could hold up on nights with the second valve. These two valves. And he just asked me how I felt, and I told him, and he said he didn't - he didn't recommend it.

Henderson Deposition at p.88. Cash wrote a "To Whom It May Concern" letter stating that he did "not feel that it is medically appropriate for [the plaintiff] to work on the night shift. I feel that his cardiac condition may be compromised if he works nights." Sheriff Mullins also communicated with Dr. Cash following plaintiff voicing his objections to working the night shift and was told by Dr. Cash that the plaintiff, himself, would have to decide whether or not he could work the night shift. In his response to Sheriff Mullins, Dr. Cash did not place any work restrictions on plaintiff, but only told Mullins that "if day shift cannot be offered, then Mr. Henderson will have to decide if he thinks he can work night shift, regardless of his fatigue." Thus, Dr. Cash did not issue a specific work restriction regarding the plaintiff working on the night shift, but left the decision entirely up to the plaintiff. Plaintiff never told Deputy Fitch that he was not supposed to work the night shift.

On July 23, 2001, plaintiff was informed that he was being moved to the night shift. He admits that he was told that the reason his day shift assignment had changed was because another deputy had been injured. Plaintiff told Sheriff Mullins

5

that he could not work nights and attempted to get the Sheriff to see if he could find another officer to work the night shift. When plaintiff asked the Sheriff to see if he could find someone else to work the night shift, the Sheriff said, "No. Just go on home." Plaintiff never had a discussion with Sheriff Mullins about working any other day shift job at the jail, although he contended in his deposition that he would have worked such a job.

Defendant has recently taken the deposition of the plaintiff's treating cardiologist, Dr. Gordon Cash. Dr. Cash testified that at the time of his termination in 2001, plaintiff could not sustain walking on a treadmill for more than four minutes at a normal pace, that he had fatigue and chronic pain, and that his limitations were expected to be long term. Dr. Cash testified as follows:

> Q. And just to make [sure] I understand clearly, what were his symptoms? Excuse me. What were his limitations that were expected to be long-term?
>
> A. Well, the reduced exercise tolerance. Fatigue. He had some chronic pain also. People who take Coumadin, even if they don't bleed, tend to have chronic anemia, and he would get - that would be one of the things that would tire him.
>
> Q. And then [Paragraph 7 of your affidavit] says Mr. Henderson suffers anemia that tires and causes him fatigue with even minimally prolonged activity. Is that kind of also, in summary, what you just said?
>
> A. I think so.

6

> Q. And, again, that word "fatigue," I mean that's kind of a - very general -
>
> Q. recurring theme throughout our conversation today?
>
> A. Yes.

Cash Deposition at 39. Plaintiff suffers from chronic atrial fibrillation which Dr. Cash testified means that his heart "does not function normally and does not provide him with the circulation necessary for the maintenance of a normally functioning body." Dr. Cash also testified that, as a result of the Coumadin prescribed to him, the plaintiff would be precluded from lines of work in which there is a possibility he could cut himself.

## II.

### *Summary Judgment Standards*

Pursuant to Rule 56, summary judgment shall be rendered when requested if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. It is the burden of the party seeking summary judgment to show the court that, under uncontradicted facts, the moving party is entitled to judgment as a matter of law. Summary judgment is intended to provide a quick, inexpensive means of resolving issues as to which there is no dispute regarding the material facts. *Celotex Corp.*

7

*v. Catrett*, 477 U.S. 317 (1986). In assessing the validity of a summary judgment motion, the court views the pleadings, depositions, answers to interrogatories, admissions, and competent affidavits in a light most favorable to the opponent of the motion. However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which the party will bear the burden of proof at trial. *Catrett*, 477 U.S. at 322.

III.

***Whether the Lincoln County Sheriff's Department
Is A Suable Entity***

Defendant initially contends that the Lincoln County Sheriff's Department is not a suable entity. It is undisputed that at least in § 1983 actions, a separate claim against a sheriff's office is rightly dismissed on the basis that this "office" is not a cognizable legal entity separate from the county government. *See Ravene v.*

8

*Charles County Commissioners*, 882 F.2d 870, 874 (4th Cir. 1989). Thus, at least if this were a § 1983 action, the proper defendant would be Lincoln County. In *Bristol v. Board of County Commissioners of County of Clear Creek*, 312 F.3d 1213 (10th Cir. 2002), the Tenth Circuit Court of Appeals held that the question of who the employer is under the ADA rests primarily with who makes hiring and firing decisions. *Id.* at 1221. That question is often a question of fact. *Id.*

It appears in this case that it was the Sheriff who made the hiring and firing decisions, so it would have been Sheriff Mullins who was the properly named defendant. However, because as set out below plaintiff cannot establish a *prima facie* discrimination claim under the ADA or a retaliation claim, the court need not and does not address the question of the proper naming of the defendant.

IV.

### Plaintiff's ADA Claim

To survive summary judgment on his ADA claim, plaintiff must present sufficient evidence "(1) that he is disabled within the meaning of the ADA, (2) that he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) that he suffered an adverse employment decision because of his disability." *Stokes v. Hamilton County, Tennessee*, No. 03-5751, 2004 WL 2452549 (6th Cir. Oct. 28, 2004).

9

Even if we assume that plaintiff is disabled within the meaning of the ADA, the court finds that as a matter of law he is not qualified to perform the essential functions of his job with or without reasonable accommodation. As indicated above, plaintiff's job was as a deputy sheriff. Whether working the day shift or night shift, the deputy sheriff's position required that the deputy work in a potentially dangerous and physically challenging environment. He is required to pass strenuous physical requirements. He must be able to effect an arrest of his own and be able to back up another deputy if necessary, for his own safety and that of fellow officers. The deputies must be capable of using physical force to effect arrests, including anything from light restraint to wrestling, using a weapon, running and physical exertion. Plaintiff acknowledged that he would occasionally have to apprehend suspects and that the resulting confrontations could be violent at times. Although apparently the more strenuous activities were more likely to occur on the night shift, they nevertheless could occur during the day and, for the safety of officers and the public, a single deputy sheriff could not be excused from performing the more strenuous activities.

As indicated in the deposition of plaintiff's own cardiologist, at the time of his termination plaintiff had reduced exercise tolerance and fatigue. He could not sustain walking on the treadmill for more than four minutes at a normal pace, he had fatigue and chronic pain, and his limitations were expected to be long term.

10

Moreover, under the medicine prescribed for him, the plaintiff would be precluded from lines of work in which there was a possibility that he could cut himself. It is obvious from the physical findings of Dr. Cash that at the time of plaintiff's termination he could not perform the job of a deputy sheriff, either on the day shift or the night shift, with or without reasonable accommodation. Accordingly, plaintiff cannot establish a *prima facie* case of discrimination on the basis of his purported disability.

V.

*Plaintiff's Retaliation Claim*

Plaintiff contends that Sheriff Mullins retaliated against him by refusing to rehire him after he filed his EEOC claim. Sheriff Mullins' position is and has been with respect to rehiring the plaintiff that if he could meet the physical requirements of the job, he could be rehired. However, there is no evidence in the record that plaintiff has ever, at least since his second operation, met the physical requirements of the job of deputy sheriff. Plaintiff's self-serving opinion that he met the requirements of the job, at least during the day shift, is simply not supported by the specific job requirements for the position of deputy sheriff compared with the physical restrictions which Dr. Cash concedes restrict the plaintiff.

11

Moreover, plaintiff has presented no evidence that he has ever applied for any other less stress-related jobs contained in the Sheriff's Department, should such a job exist. Plaintiff implies that there may be other jobs in the jail that he may be qualified for, even with his exertional limitation. However, plaintiff has not applied for one of those jobs, nor have the physical requirements of such a job ever been described in the record. Accordingly, there is no evidence in the record that Sheriff Mullins retaliated against the plaintiff as a result of his filing of the EEOC claim when he declined to give the plaintiff back a job as a deputy sheriff or to consider him for a less stressful position.

## VI.

### *Conclusion*

In light of the foregoing, defendant's motion for summary judgment [Court Files #13, #16, #34] will be granted and this action dismissed.

Order accordingly.

<u>s/ *James H. Jarvis*</u>
UNITED STATES DISTRICT JUDGE
